## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SWEET SAGE CAFÉ, LLC,

      Plaintiff,

v.                              CASE NO:  8:15-CV-2576-T-30JSS

TOWN OF NORTH REDINGTON
BEACH, FLORIDA,

      Defendant.

_____/

## ORDER

THIS CAUSE comes before the Court upon Plaintiff's Motion for Summary Judgment (Dkt. 19), Defendant's Motion for Summary Judgment (Dkt. 20), and the parties' respective Responses thereto (Dkts. 24, 25).  The Court, upon review of the motions, responses, record evidence, and being otherwise advised in the premises, concludes that Plaintiff's motion should be granted and Defendant's motion should be denied.  Accordingly, final judgment will be entered in Plaintiff's favor.

## INTRODUCTION

Defendant Town of North Redington Beach, Florida (the "Town"), has a comprehensive sign ordinance that prohibits the display of non-commercial and commercial outdoor signs without a permit, but exempts more than 17 categories of signs.  Plaintiff Sweet Sage Café, LLC is a casual beach-themed restaurant located in North Redington

Beach, FL.  Plaintiff was cited for violating Defendant's sign ordinance.  Plaintiff argues that

Defendant's sign ordinance violates the First Amendment.  The Court agrees with Plaintiff,

and concludes that Defendant's sign ordinance is a content-based regulation of speech that

does not survive strict scrutiny.  As such, the sign ordinance is facially unconstitutional and

Defendant will be permanently enjoined from enforcing it.

## BACKGROUND

Plaintiff operates a restaurant that offers breakfast and lunch in a casual beach-themed

setting located at 16725 Gulf Boulevard, North Redington Beach, FL, and known as Sweet

Sage Café.  (Messmore Depo. at 4, 12, 16).  The restaurant also contains a clothing boutique

that sells resort-styled clothing, novelty items, and artwork.  *Id.* at 12-15; 19.  The restaurant

itself is decorated with funky and eclectic motif items that include pictures depicting the

history of the area as well as images of marine life, tropical birds and plants, beach items, and

whimsical textual messages.  *Id.* at 17-18.  The exterior of the building is decorated to create

a "Key West" style atmosphere and to showcase the owners' sense of humor.  *Id*. at 20; 43.

Plaintiff is managed by its members, John and Barbara Messmore, who acquired the business

in approximately 2005.  *Id.* at 9.  The restaurant itself has been in operation in its current

location in the Town since approximately 1994.  *Id.*

In June of 2015, the Town adopted Ordinance 2015-759 (the "sign ordinance") to

regulate signs in the Town and replace its pre-existing sign ordinance.  (Lewis Depo. at 14;

Exhibit 1).  In relevant part, section 86-1 of the sign ordinance describes the sign ordinance's

purpose and intent as follows:

### Sec. 86-1 -Purpose and Intent.

(A)     It is the purpose and intent of this Chapter to establish a set of fair and comprehensive standards for the erection, use, installation, maintenance, alteration, and placement of all signs, symbols, markings, or advertising devices within the Town of North Redington Beach. These standards are designed to protect and promote the health, safety, welfare, and general well-being of the community's citizens in a manner consistent with the following objectives:

(1)     The Town has an economic base which relies heavily on tourism, and enhancing the visual attractiveness of the environment is important to making the Town a desirable place to visit.

(2)     To foster a good visual environment and enhance the economic well-being of the community as a place in which to live, visit, and conduct business.

(3)     To preserve the aesthetic, natural, and historical qualities of the community.

(4)     To contribute to the safe movement of traffic by controlling the excessive height, area, and bulk of signs, as well as certain types and lighting of signs which can distract the attention of pedestrians and motorists so as to constitute hazards to traffic safety.

(5)     To encourage creativity and allow the sufficient conveyance of a message in a manner which promotes traffic safety and avoids visual blight.

(6)     To control the use of signs determined to be detrimental to the aesthetic sense and welfare of the community.

(7)     To regulate signs in a manner so as not to interfere with, obstruct the vision of or distract motorists, bicyclists, or pedestrians.

(8)     To encourage signs appropriate to the zoning district in which they are located and consistent with the category of use to which they pertain.

Section 86-3 of the sign ordinance further defines a "sign" as:

SIGN - Any combination of structure and message in the form of a display, device, figure, painting, drawing, message, placard, poster, billboard, advertising structure, advertisement, logo, symbol, graphic, or other form, designed, intended, or used to advertise or inform. Drawings of articles for sale on the premises that is related to the business and/or is intended to advertise or inform, rather than being merely aesthetic, shall be classified as a sign under this Chapter. The term does not include an official traffic control sign, official marker, national or state flags permitted by this Chapter, athletic scoreboards, or the official announcements or signs of government. "Sign" includes sign structure.

Section 86-4 titled "Permit Required" instructs as follows:

(A)     No person shall erect, demolish, alter, rebuild, enlarge, extend, relocate, repair, do any work upon, attach to, or suspend from a building or structure, any sign unless a permit for such sign has been issued by the Building Official or unless such sign is specifically exempted from permit requirements.

(B)     Where it is proposed to modify or repair any sign at a cost greater than 50% of replacement cost less depreciation, the sign must be brought into full compliance with all Town codes, including this Chapter.

(C)     It shall be unlawful to change, modify, alter, or otherwise deviate from the terms or conditions of a sign permit without the prior written approval of the Building Official. A written record of such approval shall be entered upon the original permit application and maintained in the files of the Building Official.

-4-

(D)     Applications for permits required by this Chapter shall be in writing upon forms to be furnished by the Building Official.

(E)     Any repair work on a sign of a structural nature shall require a separate building permit. Simple, non-structural maintenance of a sign shall not require a permit.

(F)     A sign permit shall become invalid unless the work is commenced within 60 days after its issuance, or if the work is suspended or abandoned for a period of 30 days. In any event, the work shall be pursued diligently after commencement and shall be completed with a period of four months following the date of issuance.

(G)     Failure to obtain a final satisfactory inspection within the permit period shall render the permit invalid, and the applicant shall be required to reapply for a permit or remove the sign or sign structure.

Section 86-10 of the sign ordinance exempts from the permit requirement certain "signs" as follows:

The following signs shall be exempt from the permit requirements of this Chapter, provided that all other applicable sections of this Chapter are met:

(A)     Government signs.

(B)     National flags flown in accordance with the standards of the Adjutant General.

(C)     Warning signs.

(D)     Murals, statues, paintings, designs, or other decorative features provided no names of occupants, drawings of the business' products, identification, trademark, logo, or other written messages are present.

(E)     Holiday, seasonal, commemorative or special event decorations or signs provided that such signs display no commercial advertising and provided that such signs are displayed only between November 15th and January 10th.

(F)     Memorial signs or tablets, names of buildings and date of erection when cut into any masonry surface or when constructed of bronze or other non-combustible materials.

(G)     Garage sale signs, provided:

(1)     One sign is on site with two additional signs allowed in right of ways. No signs shall be allowed in medians.

(2)     The number does not exceed 3 per site.

(3)     The size does not exceed 3 square feet.

(4)     The sign does not exceed 4 feet in height.

(5)     The sign is removed promptly after the completion of the activity.

(H)     Real estate open house and auction directional signs, provided:

(1)     Two (2) directional signs may be permitted between the hours of 8 a.m. and 6 p.m. only on those days when there is a scheduled and advertised open house or auction;

(2)     Each sign may not exceed four (4) square feet in area;

(3)     The signs may be located within public right-of-way except in the medians of Gulf Boulevard.

(4)     The signs must be freestanding and of a professional lettered quality, and may, under no circumstance, be affixed to a tree, utility pole, traffic control sign, any existing sign or within the visibility triangle;

(5)     The signs must be removed immediately following the event;

(6)     For purposes of this section, the following definitions shall apply:

       (a)    *A real estate open house* shall be described as when a residential or commercial property, actively being marketed for sale, is made available for viewing by prospective purchasers or other real estate agents without prior appointment;

       (b)    *A real estate auction* shall be defined as the offering of residential, commercial or vacant real estate for sale to the highest bidder. Said auction may or may not include the contents of the property and must be conducted on the premises by a licensed real estate broker. A real estate auction does not include garage sales or tag sales.

(I)    One non-illuminated construction sign per street frontage subject to the provisions of section 86-30 herein. Such sign must be removed before a Certificate of Occupancy is issued.

(J)    One non-illuminated real estate sign per parcel subject to the following restrictions:

       (1)    The property is for sale, rent or lease.

       (2)    The sign is on site.

       (3)    The maximum sign area in residential zoning districts shall be limited to 4 square feet in aggregate area.

       (4)    The maximum sign area in nonresidential zoning districts shall be limited to 16 square feet per sign face.

       (5)    Waterfront properties are allowed one additional sign on the water side.

       (6)    Multiple listing strips, in addition to the maximum sign area, broker identification strips and sold signs are allowed when attached to a real estate sign. Signs shall be removed within 10 days of the date when ownership has changed or the property is no longer for sale, rent, or lease.

(K)    Political campaign signs.

(L)     Window signs on the ground floor which identify or advertise activities, services, goods, or products available on the parcel. Signs may cover no more than 50% of the window area.

(M)     Signs incorporated on machinery, equipment, or vehicles at the manufacturer's or distributor's level, which identify or advertise only the product or service dispensed by the machine, equipment, or vehicles, and signs customarily affixed to vending machines, newspaper racks, telephone booths, gasoline pumps, taxi cabs, buses, or other modes of general public transportation.

(N)     Interior signs which are displayed on the inside of a building and not visible from a public street.

(O)     "No trespassing," "no dumping," "no loitering," and like signs not exceeding 3 square feet in area, and not exceeding 2 signs per parcel or site.

(P)     Addressing numbers displayed in accordance with Pinellas County requirements.

(Q)     In nonresidential districts, 2 directional signs per driveway which signs shall be located on and pertain to a parcel of private property. Each sign shall not exceed 4 square feet in sign area per face. The maximum height shall be 3 feet. If such sign area is to be illuminated then a sign permit shall be obtained in accordance with the requirements of this Article. Directional signs may be placed with a 2 foot setback from the right-of-way provided that such signs meet all other applicable regulations and do not block visibility.

(Lewis Depo. at Exhibit 1).

In August of 2015, the Town issued a Notice of Violation to Plaintiff that identified numerous violations of the sign ordinance. (Lewis Depo. at Exhibit 5). Specifically, the violations related to the following items decorated on or near the exterior of the restaurant:

a)    Flip-flop footprint decals[1] applied to the white vinyl fence surrounding the

parking lot (the "Flip-Flop Footprints");

b)    A plastic display panel set next to a dog bowl containing the message "Paws

for Water" (the "Paws for Water Display")[2];

c)    A plastic display panel attached to a white picket fence along the entrance

reading "No Tiptoeing through our Tulips" (the "No Tiptoeing Display")[3];

d)    A small display panel set inside a planter reading "Sense of humor required"

(the "Sense of Humor Display")[4];

_____

[1]

Plaintiff does not sell flip-flops. John Messmore testified that the Flip-Flop Footprints were adhesive decals he added to provide color to the white vinyl fence in order to make the plain fence more decorative. The Town's attorney, Jay Daigneault, testified that he believed the Flip-Flop Footprints constituted a sign under the sign ordinance because, in his mind, they appeared to attract business to Plaintiff. (Messmore Depo. at 15, 24, 26; Daigneault Depo. at 48-50).

[2]

Notably, Plaintiff is not a dog-friendly restaurant. John Messmore testified that the Paws for Water Display was intended to be humorous—it was not there to encourage people to take their dogs to the restaurant. Daigneault testified that it was a violation of the sign ordinance because it could be interpreted as encouraging people to visit the restaurant. (Messmore Depo. at 48; Daigneault Depo. at 54-55).

[3]

John Messmore testified that the display was intended to be a fun play on the Tiny Tim song "Tiptoeing Through the Tulips" and that he did not have any tulips and was not otherwise warning people to stay out of the flowers. Daigneault testified that the display was a sign and not a decoration because, under his interpretation, the sign was advertising Plaintiff's quirky atmosphere. (Messmore Depo. at 31-32; Daigneault Depo. at 52-56).

[4]

According to John Messmore, the Sense of Humor Display was decorative and meant to make people smile as they entered the restaurant. Daigneault believed that it was a sign because it was advertising Plaintiff's quirky and fun theme.

e)    A large decorative panel attached to the side of the restaurant building designed to look like a pair of giant flip-flops with cutouts where guests may peek through and have their pictures taken - the display side also contained the text "Flip-Flop" at the top, "Sweet Sage Café" on the left flip flop and "Women are Always Right" on the right flop-flop (the "Flip-Flop Photo Op")[5].

(Complaint, Exhibits A-E).

Plaintiff was also cited for having an additional parking sign. Specifically, Plaintiff affixed a white plaque with black lettering to the white vinyl fence surrounding the parking lot, which contained the words "additional parking," along with an arrow pointing to the next through street (the "Additional Parking Sign"). (Complaint at Exhibit A). The Notice of Violation identified the Additional Parking Sign as a sign that was subject to removal under the sign ordinance. In addition, it was identified as being in excess of a two-sign limit for directional signs. (Lewis Depo. at Exhibit 3).

Plaintiff removed each item identified in the Notice of Violation in order to avoid further code enforcement proceedings. Subsequently, Plaintiff filed the instant action,

---

[5] Messmore testified that the Flip-Flop Photo Op was merely a photo opportunity so that visitors could take their picture. Daigneault believed it was a sign because it was intended to advertise or inform the public that Plaintiff is quirky and offbeat. (Messmore depo. at 33-35; Daigneault depo. at 57-58).

-10-

challenging the constitutionality of the sign ordinance under the First Amendment. Now, both parties move for summary judgment.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49 (1986).

## **DISCUSSION**

## I.    **Defendant's Motion for Summary Judgment**

Defendant's motion for summary judgment argues that Plaintiff failed to exhaust its administrative remedies because Plaintiff filed this action before it pursued any remedies under the Town's Code Enforcement process.  Defendant also appears to briefly argue that the claims in this case are not ripe.  These arguments are unconvincing and largely ignore well-established law on the issues of exhaustion and ripeness in the context of a civil rights proceeding under 42 U.S.C. § 1983.

As a threshold issue, the law is clear that parties raising federal claims under § 1983 are generally exempt from any requirement that they first exhaust administrative remedies. *See Patsy v. Bd. of Regents of the State of Florida,* 457 U.S. 496, 500 (1982); *Wilson v. Florida Bd. of Regents*, 694 F.2d 239, 239 (11th Cir. 1982) (reversing dismissal for failure to allege exhaustion of administrative remedies); *see also Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1226 (11th Cir. 2006) (noting that the plaintiff was not required to exhaust administrative remedies before challenging the defendant's sign ordinance under § 1983).

Although the crux of Defendant's argument is that Plaintiff failed to exhaust its administrative remedies, Defendant also asserts that this failure renders Plaintiff's claims unripe because there was never any final determination by a code enforcement board or

magistrate as to whether Plaintiff actually violated Defendant's sign ordinance.[6]  However, this argument fails for two main reasons.  First, Plaintiff received a Notice of Violation under Defendant's sign ordinance; in other words, Plaintiff was directly harmed by Defendant's conduct and faces the threat of future enforcement of the sign ordinance.  *See Beaulieu*, 454 F.3d at 1227-30 (discussing the constitutional ripeness requirements in a first amendment case).

Second, and as Plaintiff discusses in more detail in its response to Defendant's motion, Plaintiff asserts a facial challenge to Defendant's sign ordinance.  When such a challenge is made in the first amendment context, a plaintiff need not suffer direct harm under the "overbreadth" doctrine, which enables persons "who are themselves unharmed by the defect in a statute nevertheless to challenge that statute on the basis that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484 (1989) (internal quotations and citations omitted); *see also Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1571 (11th Cir. 1993) (discussing same); *Nat'l Advert. Co. v. City of Fort Lauderdale*, 934 F.2d 283, 285 (11th Cir. 1991).

Accordingly, Defendant's motion for summary judgment is denied.

---

[6]

Notably, the question of ripeness is conceptually distinct from the exhaustion doctrine.  *See Beaulieu*, 454 F.3d at 1227 (distinguishing between exhaustion and ripeness). Even when a plaintiff does not need to exhaust its administrative remedies before filing suit under § 1983, a plaintiff must nevertheless meet constitutional ripeness requirements.  *See id.*

## II.     Plaintiff's Motion for Summary Judgment

Plaintiff's motion argues, in relevant part, that Defendant's sign ordinance is facially unconstitutional because it regulates based upon the content of the speech and cannot survive strict scrutiny.  The Court agrees, based on binding precedent from the recent United States Supreme Court opinion in *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015) and the Eleventh Circuit opinion in *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250 (2005) (applying the same test articulated in *Reed* to a city sign code).

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed*, 135 S. Ct. at 2226 (quoting U.S. Const., Amdt. 1).  A government, including a municipal government vested with state authority, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id.* (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).  A law that targets speech based on its "communicative content" is presumptively unconstitutional and may be justified "only if the government proves that [the law is] narrowly tailored to serve compelling state interests." *Id.* (citations omitted).

In *Reed*, the Supreme Court considered whether the defendant town's sign code was content based on its face.  The defendant town's "comprehensive code" prohibited the display of outdoor signs without a permit, but, like Defendant's sign ordinance here, exempted 23 categories of signs. *Id.* at 2224.  Included among the exemptions were

-14-

directional signs, political signs, and ideological signs. *Id.* at 2224-25. The plaintiff, a pastor of a small church, had been cited multiple times under the town's sign code for posting temporary signs that directed church members to services. The church was cited for exceeding time limits for the display of temporary directional signs and for failing to include the date of the event on the signs. *Id.*

The Court concluded that the defendant's sign code was content based on its face because, whether the sign code restrictions applied to a particular sign, depended "entirely on the communicative content of the sign." *Id.* at 2227. The Court noted that the sign code defined "Temporary Directional Signs" on the basis of whether a sign conveyed the message of directing the public to church or some other "qualifying event," "Political Signs" on the basis of whether a sign's message is "designed to influence the outcome of an election," and "Ideological Signs" on the basis of whether a sign "communicates a message or ideas" that do not fit within the code's other categories. The sign code then subjected each of these categories to different restrictions. *Id.* at 2227-31. The Court stated:

> The restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign. If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government. More to the point, the Church's signs inviting people to attend its worship services are treated differently from signs conveying other types of ideas. On its face, the Sign Code is a content-based regulation of speech. We thus have no need to

> consider the government's justifications or purposes for enacting the
> Code to determine whether it is subject to strict scrutiny.

*Id.*

Similarly, Defendant's sign ordinance is, on its face, a content-based regulation of speech.  The sign ordinance purports to govern all signs within the Town but then exempts numerous categories of signs from the permit requirement, like government signs, holiday and seasonal signs, political campaign signs, and warning signs.   These exemptions necessarily depend upon the content of the signs and require the Town's enforcement officer to evaluate the content of the sign to determine whether an exemption applies.[7]  This is precisely the type of content-based regulation eschewed by the Supreme Court in *Reed*.

Notably, pre-*Reed*, the Eleventh Circuit subjected content-based sign ordinances, like Defendant's sign ordinance here, to a strict scrutiny analysis.  *See Solantic*, 410 F.3d at 1255 (holding that a sign ordinance with 17 content-based exemptions was a content-based regulation and unconstitutional on its face because it did not survive strict scrutiny).   In *Solantic*, the plaintiff was a business operating emergency medical care facilities in various locations, including the City of Neptune Beach.  The plaintiff installed in front of its Neptune Beach facility a large "Electronic Variable Message Center" (EVMC) sign.  The EVMC sign sat in the middle of a pole, approximately 10 to 12 feet above the ground, and was situated

---

[7]

 Indeed, the Town's Code Enforcement Officer, Don Lewis, testified that he needed to read a sign and interpret its content in order to determine how to classify it under the Town's sign ordinance. (Lewis Depo. at 23, 65).  And, as described above, the Town's attorney, Daigneault, was clearly examining the content of Plaintiff's signs to determine how to classify them.

-16-

below a larger blue sign displaying Solantic's business name.  The EVMC sign "was used for, and is intended to be used for, commercial messages, i.e. to identify Solantic's business and to convey information about its products and services, and for noncommercial messages, i.e. to promote social and health ideas and causes."  The defendant city sent plaintiff a notice of violations of various sections of the city's sign code.  *See id.* at 1252.

Like Defendant's sign ordinance here, the sign code in *Solantic* regulated all signs located in the city but then contained 17 enumerated exemptions from the regulations, like exemptions for holiday decorations, religious displays, and public warning signs.  *See id.* at 1257.   The Eleventh Circuit concluded that: "Because most (though not all) of the exemptions from the sign code are based on the content—rather than the time, place, or manner—of the message, we are constrained to agree with Solantic that the sign code discriminates against certain types of speech based on content."  *Id.* at 1258.  In other words, the sign code was not content neutral.  *See id.*  The sign code was subjected to strict scrutiny, "meaning that it is constitutional only of it constitutes the least restrict means of advancing a compelling government interest."  *Id.*

Thus, having concluded that the Town's sign ordinance is content-based, the Court must now determine whether the sign ordinance survives strict scrutiny.  The Court concludes that it does not.  As set forth in section 86-1 of the sign ordinance, the purpose and intent of the code is to protect and promote the health, safety, and welfare of the community by establishing a set of comprehensive standards for the use and placement of signs, symbols,

and markings.  The code further describes its objectives as including: the enhancement of visual attractiveness, preservation of aesthetic qualities, and promotion of traffic and pedestrian safety.  The law is clear, however, that such general and abstract aesthetic, business, and traffic safety interests are generally not considered so compelling as to justify content-based restrictions on signs.  *See Solantic*, 410 F.3d at 1267-68; *Dimmitt*, 985 F.2d at 1570.

Moreover, even assuming, for the sake of argument, that the Town's stated interests could be considered compelling, the sign ordinance's enumerated exemptions are not narrowly tailored to accomplish the Town's asserted interests.  In *Solantic*, the Eleventh Circuit described how the city's sign code was not narrowly tailored to accomplish the city's interests in promoting aesthetics and traffic safety because the exemptions contained within the code had nothing to do with those government interests:

> The code does not, however, explain how [aesthetics and traffic safety] affect motorists' safety, or why a moving or illuminated sign of the permissible variety—for example, a sign depicting a religious figure in flashing lights, which would be permissible under [the code's] exemption for "religious displays"—would be any less distracting or hazardous to motorists than a moving or illuminated sign of the impermissible variety . . .

410 F.3d at 1267-68.

The Town's sign ordinance succumbs to strict scrutiny for the same reasons as the contested regulations in *Solantic and Reed*: it is "hopelessly underinclusive."  For example, in *Reed*, the Court noted that the town placed "strict limits on temporary directional signs .

-18-

. . while at the same time allowing unlimited numbers of other types of signs that [diminish aesthetic appeal]."  135 S. Ct. at 2231.  Similarly, the Town offers no rationale for why political campaign signs or government signs, as opposed to signs advertising local businesses, increase the Town's aesthetic appeal in such a way as to merit different treatment.  Another example is the exemption contained within the Town's sign ordinance for "[n]ational flags": the flag of a private or secular organization is "no greater an eyesore" than a "national" flag.  *Id.*  And works of art that reference a product or service do not necessarily detract from the Town's physical appearance any more than other works of art. From a traffic safety standpoint, it is even more unclear how signs advertising local businesses would be more distracting than political or warning signs.

In sum, the Town's sign ordinance fails to survive strict scrutiny because its enumerated exemptions create a content-based scheme of speech regulation that is not narrowly tailored to serve a compelling government purpose.  Morever, these exemptions are not severable from the remainder of the sign ordinance because "[i]t is not clear that the legislature would have enacted the [sign ordinance], complete with its permit requirement and restrictions on form, even without the exemptions.  The legislature might have preferred not to impose these regulations on any signs if doing so meant that all signs would be subjected to these rules."  *Solantic*, 410 F.3d at 1269.  In other words, the sign ordinance's regulations and exemptions are not "so inseparable in substance that it can be said that the Legislature would have passed the one without the other."  *Id.* (citations omitted).

Accordingly, the Court concludes that the Town's sign ordinance is facially unconstitutional under the First Amendment.

It is therefore **ORDERED AND ADJUDGED** that:

1.      Plaintiff's Motion for Summary Judgment (Dkt. 19) is **granted**.

2.      Defendant's Motion for Summary Judgment (Dkt. 20) is **denied**.

3.      The Clerk is directed to enter a **Final Judgment** in Plaintiff's favor and against Defendant (1) **DECLARING** that Defendant's sign ordinance, specifically, Ordinance No. 2015-759, unconstitutionally infringes the right of free speech protected by the First and Fourteenth Amendments to the United States Constitution and (2) **PERMANENTLY ENJOINING** Defendant from enforcing Ordinance No. 2015-759.

4.      The Clerk is directed to close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on January 27, 2017.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

-20-